J-S61017-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.T.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.L.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1332 EDA 2017 |

Appeal from the Decree Entered March 23, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000877-2016,
CP-51-DP-0002123-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: S.T.H.-C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.L.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1335 EDA 2017 |

Appeal from the Decree Dated March 23, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000878-2016,
CP-51-DP-0000314-2015

| IN THE INTEREST OF: S.A.S.H.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.L.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1338 EDA 2017 |

Appeal from the Decree Entered March 23, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000879-2016,
CP-51-DP-0000313-2015

| IN THE INTEREST OF: S.T.H.-C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.L.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1340 EDA 2017 |

Appeal from the Decree Entered March 23, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000880-2016,
CP-51-DP-0002122-2014

| IN THE INTEREST OF: S.S.A.H.-C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.L.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1342 EDA 2017 |

Appeal from the Decree Entered March 23, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000881-2016,
CP-51-DP-0002120-2014

J-S61017-17

BEFORE: LAZARUS, J., RANSOM, J., and PLATT*, J.

MEMORANDUM BY RANSOM, J.: **FILED OCTOBER 19, 2017**

Appellant, S.L.C. ("Mother"), files this appeal from the decrees entered March 23, 2017, in the Philadelphia County Court of Common Pleas, by the Honorable Allan L. Tereshko, accepting Mother's Voluntary Relinquishment of Parental Rights to her five minor children, S.T.C. ("Child 1"), born in May of 2014; S.T.H.-C. ("Child 2"), born in April of 2006; S.A.S.H.-C. ("Child 3"), born in August of 2009; Sa.T.H.-C. ("Child 4"), born in November of 2011; and S.S.A.H.-C. ("Child 5"), born in May of 2008 (collectively, the "Children"), terminating Mother's parental rights to the Children, and changing the Children's goal to adoption.[1, 2]  After review, we affirm the trial court's decrees.[3]

In its opinion pursuant to Pa.R.A.P. 1925(a), the trial court set forth the factual and procedural history of this matter, which the record evidence supports.  As such, we adopt it herein and for the purpose of further appellate review.  Trial Court Opinion ("TCO"), 6/7/17, at 3-13.

_____

* Retired Senior Judge assigned to the Superior Court.

[1] J.F. is the father of Child 1.  W.H. is the father of Child 2, Child 3, Child 4 and Child 5.  Both J.F. and W.H.'s parental rights were involuntarily terminated by decree the same day.  Neither J.F. nor W.H. has filed notices of appeal with regard to any child.

[2] Mother has two other children in DHS custody that are not subject to this appeal.

[3] This Court consolidated these appeals by Order dated May 23, 2017.

- 3 -

By way of background, the family became known to DHS on July 15, 2014, when DHS received a General Services Report, which alleged that the Maternal Grandmother of the Children had physically abused Child 1. *Id.* at 3. On August 8, 2014, in-home services were implemented through the Community Umbrella Agency ("CUA") Catholic Social Services. *Id.* Child 1, Child 4, and Child 5 were adjudicated dependent on September 15, 2014. *Id.* at 5. Child 2 and Child 3 were adjudicated dependent on February 26, 2015. *Id.* at 11. Permanency review hearings were held on April 13, 2015, July 6, 2015, and November 9, 2015. *Id*. at 10-12. The first termination hearing was held on October 13, 2016, before the Honorable Allan L. Tereshko. *Id.* at 14. On this date, prior to the hearing, and after consultation with her attorney, Mother signed a Petition for Voluntary Relinquishment of Parental Rights and a Petition to Confirm Consent. *Id.* at 1-2. The trial court took this under consideration, and held the matter in abeyance to await the expiration of the period of time in which Mother could withdraw her voluntary relinquishment. *Id.* at 21. DHS filed the Petition for Voluntary Relinquishment of Parental Rights and a Petition to Confirm Consent on December 21, 2016, and a hearing on the petition was held on March 23, 2017. *Id.* at 2. At both hearings, the trial court heard testimony from Tracy McNair, the CUA social worker. Mother was present for both hearings, but did not testify on her own behalf.

On March 23, 2017, the trial court entered decrees granting Voluntary Termination of Parental Rights for the Children as to Mother, and changed the

Children's permanency goals to adoption. Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed its Rule 1925(a) opinion on June 7, 2017.

On appeal, Mother, through counsel, raises the following issue for our review:

> Did the [trial] [c]ourt err as a matter of law and abuse its discretion in refusing to allow [M]other to revoke her Voluntary Relinquishment of Parental Rights which were executed more than thirty (30) days prior to the Termination of Parental Rights hearing but to which she testified were signed under duress and threat by the CUA case manager, that a Dependent Petition would be filed for a minor child in her care and uninvolved with [DHS][?]

Mother's Brief, at 3.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Further, as set forth by our Supreme Court:

> A party seeking to disturb a termination decree must show that the consent given to terminate parental rights was not intelligent,

- 5 -

voluntary and deliberate. ***See Susko Adoption Case***, 363 Pa. 78, 83, 69 A.2d 132, 135 (1949) ("consent prescribed by the Adoption Act is a parental consent that is intelligent, voluntary and deliberate."); *accord **Chambers Appeal**,* [452 Pa. 149, 153, 305 A.2d 360, 362 (1973) ] ...; ***In re Fritz**,* 460 Pa. 265, 333 A.2d 466 (1975).

***In re M.L.O.**,* 490 Pa. at 240, 416 A.2d at 89–90.

Mother argues the trial court erred as a matter of law and abused its discretion by refusing to allow Mother to revoke her voluntary relinquishment of parental rights, which she maintains were signed under duress and threat by the CUA case manager. Mother's Brief, at 5. Mother further argues the CUA case manager threatened that, unless Mother signed a voluntary relinquishment, a dependency petition would be filed for a minor child in Mother's care who was not involved with DHS. ***Id.***

At the October 13, 2016 hearing, Tanesha Clement, Assistant City Solicitor representing DHS, stated on the record that Mother signed a voluntary relinquishment of parental rights petition moments before the hearing. Notes of Testimony ("N.T."), 10/13/16, at 7. Ms. Clement requested that Mr. McNair testify for the purpose of establishing grounds for involuntary termination of Mother's parental rights to the Children, and asked the trial court to hold its decision in abeyance until the voluntary relinquishment for the Children matured. ***Id.***

At the March 23, 2017 hearing, the trial court again heard testimony from Mr. McNair. Mr. McNair testified he was present when Mother signed the Petitions for Voluntary Relinquishment of Parental Rights and the Consent of

Birth Mother. N.T., 3/27/17, at 27. Mr. McNair further testified that Mother did not appear to be under the influence, Mother appeared to understand both what she was reading and what Mr. McNair communicated to her, and that Mother spoke with her attorney before signing the voluntary relinquishment petition. *Id.* at 28. Mr. McNair stated that he did not promise Mother anything in return for signing the petitions and that he neither threatened nor pressured Mother. *Id.* at 29. Mr. McNair opined that Mother signed the petitions of her own free will and volition. *Id.* Mr. McNair stated that Mother contacted him via telephone and told him that she wished to revoke her consent, whereupon he advised Mother to put her wishes in writing and contact her attorney. *Id.* at 30-31.

At issue in this case is the application of Section 2711 of the Adoption Act. This Court has explained,

> "[T]he interpretation and application of a statute is a question of law that compels plenary review to determine whether the court committed an error of law." *Wilson v. Transport Ins. Co.,* 889 A.2d 563, 570 (Pa. Super. 2005). "As with all questions of law, the appellate standard of review is *de novo* and the appellate scope of review is plenary." *In re Wilson,* 879 A.2d 199, 214 (Pa. Super. 2005) (*en banc*).

*In re Adoption of J.A.S.*, 939 A.2d 403, 405 (Pa. Super. 2007), *appeal denied*, 954 A.2d 577 (Pa. 2008).

Section 2711 provides, in relevant part:

**§ 2711. Consents necessary to adoption.**

**(a)** *General rule.* -- Except as otherwise provided in this part, consent to an adoption shall be required of the following:

. . .

(3) The parents or surviving parent of an adoptee who has not reached the age of 18 years.

. . .

**(c)** *Validity of consent.* -- No consent shall be valid if it was executed prior to or within 72 hours after the birth of the child. A putative father may execute a consent at any time after receiving notice of the expected or actual birth of the child. Any consent given outside this Commonwealth shall be valid for purposes of this section if it was given in accordance with the laws of the jurisdiction where it was executed. **A consent to an adoption may only be revoked as set forth in this subsection. The revocation of a consent shall be in writing and shall be served upon the agency or adult to whom the child was relinquished**. The following apply:

(1) Except as otherwise provided in paragraph (3):
. . .

(ii) For a consent to an adoption executed by a birth mother, **the consent is irrevocable more than 30 days after the execution of the consent.**

(2) An individual may not waive the revocation period under paragraph (1).

(3) Notwithstanding paragraph (1), the following apply:

(i) An individual who executed a consent to an adoption **may challenge the validity of the consent only by filing a petition alleging fraud or duress** within the earlier of the following time frames:

(A) **Sixty days after** the birth of the child or **the execution of the consent**, whichever occurs later.

. . .

(ii) A consent to an adoption may be invalidated **only if** the alleged fraud or duress under subparagraph (i) is proven by:

. . .

(B) clear and convincing evidence in all other cases.

. . .

23 Pa.C.S.A. § 2711 (internal emphasis added).

In *In re Adoption of J.A.S., supra*, this Court stated:

Significantly, [ ] Section [2711] describes the timeline for revocation of a consent to adoption, as well as a challenge to its validity (and only on the grounds of fraud or duress). This Section further makes clear that a revocation and/or a challenge to the validity of a consent to adoption must be in conformity with the Act.

. . .

Hence the statute renders a consent to adoption irrevocable more than thirty (30) days after execution. *See* 23 Pa.C.S.A. §2711(c)(1)(ii).[2]  Additionally, the statute precludes a challenge to the validity of the consent to adoption after sixty (60) days following the birth of the child or the execution of the consent, whichever occurs later, and only upon the grounds of fraud or duress. *See* 23 Pa.C.S.A. § 2711(c)(3)(i)(A).

_____

[2] Nothing in the statutes presupposes the "validity" of the consent.

*In re Adoption of J.A.S.*, 939 A.2d at 407-408.

In its opinion, the trial court found that Mother's consent was intelligent, voluntary, and deliberate.  TCO, at 22.  Further, neither Mother nor her

attorney made any attempt to revoke that consent in writing as required. *Id.*

The trial court concluded:

> The uncontradicted evidence is that Mother was competent when explained the voluntary relinquishments. She was explained the impact of the relinquishments. The evidence is uncontested that the witness who observed believed her to be fully informed of the impact of the relinquishments both in terms of terminating her parental rights and in terms of how such a document might affect the consideration of placement of other children going forward, in that, if her rights were involuntary terminated, it could be considered by operation of law as a factor effecting the placement of [the C]hildren, another child going forward could be considered as an aggravating circumstance which is a matter not within any discretion of the Court but a matter entered by operation of law.
>
> The test is not whether she made a phone call to someone. The test is, did she file a written retraction of that statement. She was represented by current counsel at the time. Neither counsel nor Mother filed such a retraction. The statute is quite clear that the only way a retraction can be executed is by a written submission which is filed with the Court within the 30[-]day period allowed by law.
>
> Mother's execution of the voluntary relinquishment of [the C]hildren is deemed to be final and irrevocable, absent such a filing. Therefore, as a matter of law, [M]other's rights to [the C]hildren for whom she executed such document are terminated.

TCO, at 23-24 (internal citations omitted).

The trial court determined Mr. McNair testified credibly that, at the time she signed the voluntary relinquishment petitions, Mother was not under the influence of any drugs or alcohol, understood the documents, and what he communicated to her regarding voluntary relinquishment of her parental rights. *Id.* at 21. The trial court further determined Mr. McNair credibly

testified he received a phone call from Mother where she expressed her wish to revoke her consent, and that he advised her during that same call to submit a written request, and to contact her attorney. *Id.* at 22. We defer to a trial court's determination of credibility, absent an abuse of discretion, and discern no such abuse in its finding Mr. McNair's testimony credible. *In re M.G.*, 855 A.2d 68, 73-74. Moreover, the competent evidence in the record supports the trial court's determinations that Mother's consent was intelligent, voluntary, and deliberate, and that neither Mother, nor her attorney made any attempts to revoke Mother's consent in writing, as required by statute. Accordingly, we can discern no abuse of discretion or error of law in the trial court's conclusion. *See id.* Therefore, we affirm the decrees accepting Mother's Voluntary Relinquishment of Parental Children to Children, terminating Mother's Parental Rights to Children, and changing the Children's Goal to Adoption.

Decrees affirmed. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/19/2017

- 11 -

THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY
IN THE COURT OF COMMON PLEAS

| | |
|---|---|
| IN THE INTEREST OF: | : FAMILY COURT DIVISION |
| MINORS: | : JUVENILE BRANCH - Dependency |
| | : |
| S.T.C. | : CP-51-AP-0000877-2016/CP-51-DP-0002123-2014 |
| S.T.H.-C. | : CP-51-AP-0000878-2016/CP-51-DP-0000314-2015 |
| S.A.S.H.-C. | : CP-51-AP-0000879-2016/CP-51-DP-0000313-2015 |
| Sa.T.H.-C. | : CP-51-AP-0000880-2016/CP-51-DP-0002122-2014 |
| S.S.A.H.-C. | : CP-51-AP-0000881-2016/CP-51DP-0002120-2014 |
| | : |
| Appeal of | : |
| S.L.C., MOTHER | : Superior Court No. 1332 EDA 2017, |
| | :   1335 EDA 2017, 1338 EDA 2017, |
| | :   1340 EDA 2017, 1342 EDA 2017 |
| | :    CONSOLIDATED[1] |

## OPINION

## INTRODUCTION

S.L.C. ("Mother"), Appeals the Decree of Voluntary Termination of Parental

Rights issued by the Honorable Allan L. Tereshko on March 23, 2017, as to her five

minor Children: S.T.C. d/o/b 5/   /2014; S.T.H.-C. d/o/b 4/   /2006; S.A.S.H.-C. d/o/b

8/   2009; Sa.T.H.-C. d/o/b 11/   2011; and S.S.A.H.-C. d/o/b 5/   2008.

A Goal Change Petition was filed by DHS on September 27, 2016, and Hearing

was held on October 13, 2016. On this date, prior to the Hearing and after consultation

with her attorney, Lue B. Frierson, Esquire, Mother signed a Petition for Voluntary

---

[1] May 23, 2017, Consolidated Sua Sponte. Comment: Review of these matters indicates that these appeals involve related parties and issues. Accordingly, the appeals at Nos. 1332, 1335, 1338, 1340 and 1342 EDA 2017 are hereby CONSOLIDATED. See Pa.R.A.P. 513.

Relinquishment of Parental Rights and a Petition to Confirm Consent. Subsequently, DHS filed that Petition on December 21, 2016, served all parties and a Hearing was scheduled for March 23, 2017.

After two full Hearings on the merits, on October 13, 2016 and March 23, 2017, this Court found clear and convincing evidence to accept Mother's voluntary relinquishment of her parental rights to her five Children, and issue a Decree of Voluntary Termination of her Parental Rights.

On April 24, 2017, Mother, by and through her counsel, filed a Notice of Appeal with Statement of Matters Complained of Upon Appeal. Fathers, J.F., and W.H.'s parental rights were also terminated, however, they did not file an Appeal.

Mother has two other Children in DHS custody: S.T.C. d/o/b 06/ /1999 CP-51-DP-0002121-2014, and S.T.C. d/o/b: 11/ 2001-CP-51-DP-0000315-2015. These two Children, ages 17 ½ and 15 ½ do not wish to be adopted, legal custody remains with DHS, and placement of these Children remains in Foster Care. The next scheduled Court date for these Children is a Permanency Hearing on 06/19/2017.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In her Statement of Matters Complained of on Appeal, Mother avers the following:

1. The Trial Court erred as a matter of law and abused its discretion by refusing to allow Mother to revoke her Voluntary Relinquishment of Parental Rights which were executed more than thirty (30) days prior to the Termination of Parental Rights hearing but to which she testified were signed under duress and threat, by the CUA social worker, that a Dependent Petition

2

would be filed for a minor child in her care and had been uninvolved with the Department of Human Services;

2. Mother respectfully requests the right to supplement this Statement of Errors Complained of on Appeal pending receipt of Notes of Testimony in this matter.

## PROCEDURAL HISTORY:

On July 15, 2014, the Department of Human Services (DHS) received a General Protective Services (GPS) report which alleged that J.C., the Maternal Grandmother of the Children, had physically abused Child, S.T.C., d/o/b: 11/ 2001, twelve years old at the time; that it was unknown if the Child experienced any pain, injury, or impairment as a result of the alleged abuse; that the Children were staying at a neighbor's home; that the Children's Mother tried to obtain emergency housing at the Apple Tree Family Center on July 15, 2014 but no beds were available that day; that Mother left the facility and was expected to return to the home of Maternal Grandmother, as the family was transient; that Mother was unemployed; that Mother had a history of drug use; that Mother had been the victim of domestic violence by W.H., Father of four of Mother's Children, and who was incarcerated; and that the Children appeared to be very neat and clean. This report was substantiated. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "a").

On August 8, 2014, In-Home Services (IHS) was implemented through the Community Umbrella Agency (CUA) Catholic Social Services (CSS). (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "b").

On August 20, 2014, CSS was informed that three of Mother's seven Children were residing with M.D., a paternal cousin of three of the Children. This was by family

3

agreement. The other four Children were residing with T.H.-G., their maternal aunt. This was by family agreement. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "c").

On September 2, 2014, CSS held an initial Single Case Plan (SCP) meeting. The goal for the Children was "Stabilize Family Functioning." During the meeting, Mother agreed to the following objectives: 1) obtain housing; 2) contact Apple Tree Family Center by 9:00 a.m. each day, Monday through Friday; 3) obtain a cellular phone; 4) pay her overdue Philadelphia Gas Works bill; 5) satisfy her judgment with her landlord; 6) maintain the health of the Children; 7) ensure that Children attended all medical appointments. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "d").

On September 4, 2014, CSS visited Mother and the Children at 624 Brill Street, Philadelphia, PA. During the visit, CSS observed that the home was safe and appropriate for the care of the Children and that Mother appeared overwhelmed. Mother stated that she was unwilling to take all seven of the Children into a shelter. She stated that she had a friend who had a large one bedroom apartment in North Philadelphia, but Mother refused to disclose the location of the apartment. Mother admitted that she did not attend Landlord/Tenant Court because the previous landlord had stated that she did not have to reimburse any money, but she could not provide documentation for this agreement. Mother stated that she did not obtain a cellular phone or pay her gas bill because she was saving money to move into a new apartment. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "e").

4

On September 5, 2014, Dependency petitions were filed for four Children due to Mother's noncompliance with CUA objectives. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "f").

On September 15, 2014, three Children: S.S.A.H.-C., Sa.T.H.-C., and S.T.C. were adjudicated Dependent. Legal custody remained with Mother, and physical custody remained with Mother, subject to the conditions and limitations as noted by DHS, the agency that will supervise. CUA to assist Mother with exploring more permanent housing. Mother is referred to CEU for assessment and forthwith screen. CUA is to refer Mother for parenting classes. DHS has ordered bedding for the Children and should arrive by 9/16/2014. A referral to Ken Crest, Child Link is pending for the Children. (Orders of Adjudication and Disposition – Child Dependent, 9/15/2014).

On September 18, 2014, CSS visited the home of Mother at 2345 Montgomery Ave., Philadelphia, PA. During the visit, Mother admitted she had tested positive for marijuana on 9/15/2014. Mother stated she would schedule an appointment with the drug and alcohol treatment program at the Achieving Reunification Center (ARC). CSS and DHS observed that four Children resided with Mother in a one bedroom apartment, and that the Children slept in the same room in different beds. CSS determined that the home was safe and appropriate for the care of the Children. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "h").

On September 26, 2014, CSS visited Mother's home. During the visit, CSS interviewed the Child, S.T.H.-C. d/o/b: 4/24/2006, who stated that on 9/24/2014, while

5

playing basketball with a friend, he had jumped off the steps and fallen on his right leg. The Child stated that he was transported to Hahnemann Hospital by an ambulance. He further stated that he was required to be on bed rest for eight weeks. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "i").

According to St. Christopher's Hospital Discharge Summary Report, the Child, S.T.H.-C., was transferred to St. Christopher's Hospital from Hahnemann Hospital ER on September 24, 2014. The Report stated that the Child had sustained a left tibia shaft fracture during a basketball game and underwent a closed reduction casting. The Child was admitted to St. Christopher's Hospital overnight for observation. The following day, his pain was under control and he was discharged on September 25, 2014 in stable condition. Mother was instructed to administer Acetaminophen to the Child every four hours for pain. The Child was scheduled for a follow-up appointment at St. Christopher's Hospital Orthopedic Clinic on 10/3/2014. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "j").

On October 4, 2014, CSS visited Mother's home. The Child, S.T.H.-C., stated that Mother had rescheduled the 10/03/2014 appointment because she was unable to stay at the Clinic. Child stated that his next appointment at St. Christopher's Hospital Orthopedic Clinic was scheduled for 10/10/2014. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "k").

On October 10, 2014, CSS visited Mother's home. During the visit, the Child, S.T.H.-C., stated that he did not want to return to school with a cast on his leg and a

walker. Mother stated that the Child would be using a wheelchair. Mother stated that at his last medical appointment on 10/06/2014, the physician stated that his bone was healing. Mother stated that she had an intake appointment scheduled on 10/17/2014 at Men and Women of Excellence. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "l").

On October 17, 2014, CSS visited Mother's home. During the visit, the Child, S.T.H.-C., stated that his wheelchair was stolen and that he would attend school on 10/20/2014 using a walker. Mother informed CSS that the Child's school was willing to arrange in-home teaching, but she was adamant about returning the Child to school the next day. Mother stated that she was in the process of looking for a three-bedroom apartment. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "m").

On or about October 29, 2014, CSS visited Mother's home. CSS observed that seven Children were residing in the home and learned that Mother had returned the Child, S.T.H.-C., to school on 10/21/2014 in a stroller and that she needed to obtain documents from St. Christopher's Hospital Orthopedic Clinic for his recent absences. Mother stated that she visited Sobriety Through OutPatient (STOP), a drug and alcohol treatment program, but was unable to locate documents from her visit, and admitted that she had not started parenting classes. CSS informed Mother that her home was not an adequate size for seven Children. Mother stated that she was scheduled to move in November 2014. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "n").

7

On October 30, 2014, Mother tested positive for marijuana at the CEU. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "o").

Mother subsequently contacted DHS and stated that she was enrolled in CHANCES, a drug and alcohol treatment program. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "p").

On December 9, 2014, CSS visited Mother's home. During the visit, Mother stated that the heat in her home was inoperable, that the septic system was clogged, which prevented the family from flushing the toilet; and that she needed a larger home for the Children. Mother stated that she would visit the Office of Supportive Housing (OSH) later in the week and that she did not believe that her landlord owned the property. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "q").

CSS learned that the owner of the property where Mother and the Children resided had lost his rental license in 2011. Mother stated that she would place all of her furniture in storage and that the Children would temporarily reside with a family member. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "r").

On or about December 24, 2014, Mother moved to 2857 N. 20th Street, Philadelphia, PA, with the Children. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "s").

8

On December 24, 2014, DHS visited Mother's home. During the visit, the Child, S.T.H.-C., stated that he had missed his last medical appointment and that it was rescheduled for 12/30/2014. Mother stated that she was not attending substance abuse treatment because she was too busy but that she planned to return in January 2015. She stated that she was unable to pay the fines issued by the Landlord/Tenant Court but had suitable housing for the Children. CSS observed the home and determined that it was safe and appropriate for the care of the Children. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "t").

On January 15, 2015, CSS visited Mother's home. During the visit, Mother stated that the Department of Public Welfare (DPW) had terminated her benefits and sent a notice to her old address located at 2345 Montgomery Avenue. Mother stated that she had not scheduled a medical appointment for the Child because she was too busy and that she needed bus tokens to attend the appointments. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "u").

On January 28, 2015, CSS visited Mother's home. During the visit, Mother stated that she needed to relocate because her home was listed for Sheriff's sale. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "v").

On February 5, 2015, CSS visited Mother's home. CSS observed that Mother was in bed at 5:30 p.m., and she stated she was depressed; that she was looking for a home, but the person who was helping her had stopped answering the telephone; that she

did not attend parenting classes; and that she did not have documentation from her drug and alcohol treatment program. CSS informed Mother that the Children had missed numerous days of school, and Mother admitted to that. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "w").

A Permanency Review Hearing was held on February 9, 2015, before the Honorable Allan L. Tereshko. Legal custody of four Children: S.S.A.H.-C., Sa.T.H.-C., S.T.C., and S.T.C., shall transfer to DHS and placement of the Children in Foster Care shall be forthwith. DHS to obtain on OPC as to the three other siblings residing with Mother. (Permanency Review Orders (Non-Placement), 2/09/2015).

On February 9, 2015, DHS received a GPS report alleging that Mother had a history of medical neglect, failure to provide a safe environment for the Children and not completing on-going parenting goals. The report alleged that the Court had noted that Mother failed to provide adequate housing for the Children; that Mother failed to complete court-ordered parenting classes, to attend drug and alcohol treatment, to keep the Children's medical appointments for specialized services, and to prevent truancy issues with the Children. The report alleged that S.T.C. was temporarily placed with maternal great-cousin, Y.D. The report was determined to be valid. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "y").

On February 9, 2015, DHS obtained an OPC and placed three Children: S.T.H.-C., S.A.S.H.C., and S.T.C. with Y.D. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "z").

A Shelter Care Hearing was held on February 11, 2015, before the Honorable Allan L. Tereshko. The Court lifted the OPC and ordered the temporary commitment to DHS to stand for S.A.S.H.-C., S.T.H.-C., and S.T.C. Physical custody shall be with Y.D., maternal great-cousin. Mother to have supervised community visits with the Children supervised by caregivers and the CUA agency. (Shelter Care Orders, 2/11/2015).

On February 26, 2015, three Children: S.A.S.H.-C., S.T.H.-C., and S.T.C. were adjudicated Dependent. Temporary legal custody transferred to DHS. Physical custody to be with custodian, specifically with maternal great-cousin. Mother does not have appropriate housing. Children are up to date medically, and will have an updated dental exam. CUA to make referral for kinship. Mother to CEU forthwith for drug and alcohol screen, assessment, and monitoring. Mother to have supervised visits at the agency. Once Mother has suitable housing, visits can be modified by agreement of the parties. (Orders of Adjudication and Disposition – Child Dependent, 2/26/2015).

A Permanency Review Hearing was held on April 13, 2015 before the Honorable Allan L. Tereshko. Legal custody of the five Children shall remain with DHS and placement of the Children shall remain in Foster Care. Mother re-referred to CEU forthwith for drug screen, assessment, and monitoring. Mother to comply with ARC program for job training, parenting, and to comply with CEU recommendations. All appropriate services to continue for the Children. (Permanency Review Orders, 4/13/2015).

A Permanency Review Hearing was held on July 6, 2015, before the Honorable Allan L. Tereshko. Legal custody of the five Children shall remain with DHS and

11

placement of the Children shall remain in Foster Care (Kinship). DHS/CUA to conduct a PLS/prison search on Mother. Upon release, Mother is to be referred to CEU forthwith for drug screen, assessment, and monitoring. CUA to make outreach to Mother. (Permanency Review Orders, 7/06/2015).

A Permanency Review Hearing was held on November 9, 2015 before the Honorable Allan L. Tereshko. Legal custody of the five Children shall remain with DHS. Placement of the Children shall remain in Foster Care (Kinship) through Catholic Community Services. Mother to have supervised visitation as arranged by the parties. Mother is referred back to CEU for assessment, full drug and alcohol screen, once she avails herself. (Permanency Review Orders, 4/13/2015).

On February 2, 2016, Continuances were granted for all cases by the Honorable Allan L. Tereshko. (Continuance Orders, 2/02/2016).

On February 25, 2016, CSS held a revised SCP meeting. The parental objectives for Mother were to: 1) maintain sobriety; 2) comply with CEU assessment; 3) comply with the recommendations, including treatment; 4) refrain from illegal drugs and alcohol use; 5) improve parenting and protective capacity; 6) attend ARC for housing assistance; 7) obtain job training through ARC; complete a parenting program; 8) stabilize mental health; 9) engage in an assessment; 10) comply with all recommendations of mental health treatment; 11) engage in family therapy with her Children; 12) sign consents to ensure that the Children receive the necessary treatment and supports; 13) improve relationships and bonding; 14) visit her Children as permitted and agreed; 15) increase cooperation; 16) attend all hearings and conferences; 17) maintain contact with CUA-

12

CSS case manager. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 9/27/2016, ¶ "jj").

On May 19, 2016, Continuances were granted for all cases by the Honorable Allan L. Tereshko. Next Scheduled Court Date: 10/13/2016. (Continuance Orders, 5/19/2016).

Mother's criminal abstract reveals the following: **CP-51-CR-0608552-2003**-Guilty Plea on 2/27/2008 for *Manufacture/Del/Possession w/Intent to Manufacture/Delivery* and *Criminal Conspiracy Engaging- Criminal Manuf/Del/Poss/w/Intent Manuf or Del*: Dispositions: Confinement- minimum 11 months, 15 days, maximum 23 months, no parole until 23 months without further Order of the Court. Same conditions of House Arrest apply as was imposed on 2/14/2008. In addition, defendant may go to school functions and/or anything reasonably related to her Children. To submit to random drug screens; **CP-51-CR-0007559-2014**-Guilty Plea on 9/14/2014 for *Manufacture/Del/Possession w/Intent to Manufacture/Delivery* and *Criminal Conspiracy Engaging- Criminal Manuf/Del/Poss/w/Intent Manuf or Del*: Disposition: Probation 4 years, perform 20 hours of community service each year of supervision, seek and maintain employment. (CCP-Criminal Dockets, CPCMS- DHS Exhibit #3).

W.H., Father of four of Mother's Children, is currently incarcerated at SCI Huntingdon: **CP-51-CR-0010146-2011**- Guilty Plea on 6/08/2015 for *Aggravated Assault*-Disposition: Confinement-minimum 5 years, maximum 10 years, parole to be supervised by Domestic Violence Unit, participate in anger management program, no

13

negative contact with complainant, and 2 year probation. (CCP-Criminal Docket, CPCMS).

J.F., Father of S.T.C., criminal abstract reveals the following: MC-51-CR-0005679-2017-*Int Poss Contr Subst by Per Not Reg 35§780-113§§A16*: 2/28/2017 Proceed to Court. (CCP-Criminal Dockets, CPCMS- DHS Exhibit #5).

**TERMINATION HEARINGS:**

The first hearing was held on October 13, 2016 before the Honorable Allan L. Tereshko. Mother was present with her attorney Lue B. Frierson. Father, J.F., was present and represented by counsel, Emily Cherniack.

Taneshia Clement, counsel for DHS noted on the record that Mother had signed the Petition for Voluntary Relinquishment of Parental Rights, and the *Consent of Birth Mother* on this date prior to the hearing. She offered to present evidence in support of the Petition to Involuntarily Terminate the Parental Rights of Mother, and requested the Court to hold the matter in abeyance until the Voluntary Relinquishment Petitions for all five Children had matured, which according to the statute 23 Pa.C.S.A. §2711 (c) (1)(iii), the consent is irrevocable more than 30 days after the execution, and 23 Pa.C.S.A. §2711 (c) (3)(i)(A), an individual who executed a consent to an adoption may challenge the validity of the consent only by filing a petition alleging fraud or duress within the earlier of the following time frames: sixty days after the birth of the child or the execution of the consent, whichever occurs first. (N.T., 10/13/2016, p.7 at 4-25).

Ms. Clement's first witness was Tracy McNair, from Catholic Community Services, CUA. Mr. Mc Nair testified the Children were removed from Mother's care,

14

and the issues that brought the Children into care were: deplorable housing, eviction, homelessness, inadequate housing, medical neglect, truancy, and accusations of the Maternal Grandmother abusing one of the Children. (N.T., 10/13/2016, p.9 at 11-23).

He further stated that Mother has visitation with the Children, as a group, once a week for two hours. Mother appears to be bonded to the Children, but she is not always appropriate with them. Mother talks bad about the Kinship caregiver, and has to be redirected. The Children often engage in bad behavior after seeing the Mother. (N.T., 10/13/2016, p.10 at 2-25; p.11 at 1-6).

Mr. McNair testified Mother has not progressed much in providing permanency for the Children. Mother has started various programs after referrals were made, however, she then usually stops the program or has been discharged. Mother has not completed any program. (N.T., 10/13/2016, p.11 at 4-24).

He further testified the boys are placed together with the same foster parent and their interaction with the foster parent is respectable and they get along well. The Children are stable, they look to their foster parent for nurturing, affection and protection. In fact, he noted, the boys have thrived while being in placement at this home. They are going to school regularly, are doing well, are dressed appropriately, have their own bed, and their residence is suitable, thus meeting their therapeutic needs. He opined that this placement has stabilized the Children, and they are bonded with the foster parent. (N.T., 10/13/2016, p.11 at 16-25; p.12 at 1-25; p.13 at 1-6).

Mr. McNair testified that regarding the young female Child, S.T.C., who is three years old, she is in a separate home. The Child looks to her Kinship caregiver for

15

nurturing, affection, and protection. There is a parent/child love bond there. He noted the Child is thriving in that home. (N.T., 10/13/2016, p.13 at 6-25; p.14 at 1-8).

Mr. McNair opined that the Children would not suffer irreparable harm if Mother's parental rights were terminated because although, the Children have a bond with Mother, they are stable and getting their needs met with the foster parent. Mother cannot provide stability and meet her Children's needs. The Children are thriving in the homes where they live, their behavior has improved and they are stable. It is his opinion that it is in the best interests of the Children that Mother's parental rights be terminated so they may be free for adoption. (N.T., 10/13/2016, p.14 at 9-25; p.15 at 1-6).

A second hearing was held March 23, 2017, before the Honorable Allan L. Tereshko. Mother was present with her attorney Lue B. Frierson. Ms. Clement, attorney for DHS, noted that Mother was now seeking to revoke her voluntary relinquishment and consent. (N.T., 3/23/2017, p.27 at 11-25).

Ms. Clement once again called Mr. Tracy McNair as the first witness. Mr. McNair testified he was the case manager who witnessed Mother's signature to the Petition for Voluntary Relinquishment and the *Consent of Birth Mother* on October 13, 2016. He noted that he and Mother were present and Mother's attorney, Ms. Frierson, was also present. He noted that Mother did not appear to be under the influence, and she appeared to understand what she was reading and signing. He testified Mother also spoke to her attorney before she signed the documents. He stated he never received a written retraction of the voluntary statement, and he believes none was filed by Mother, nor her attorney. (N.T., 3/23/2017, p.27 at 11-25; p.28 at 1-25; p.26 at 1-5).

16

Mr. McNair testified he did not promise Mother anything in return for her signing the documents, and he did not threaten nor pressure her. He opined that Mother signed the documents of her own free will and volition that day. (N.T., 3/23/2017, p.29 at 8-16).

On cross-examination by Mother's attorney, Ms. Frierson, Mr. McNair stated that when he was explaining the voluntary documents to Mother he told her that signing could affect the Child she has who does not have any interaction with DHS. He did not believe this information would make Mother believe she was threatened or pressured. He also testified Mother called him after October 13, 2016, when she signed the documents, stating she wished to revoke her consent, and he advised her to place that request in writing and to contact her attorney to put it in writing. (N.T., 3/23/2017, p.29 at 23-25; p.30 at 1-25; p.31 at 1-8).

On cross-examination by the Child Advocate, Vincent Giusini, he asked Mr. McNair to explain what he had told Mother. Mr. McNair noted that Mother's other Child was less than one year old. He testified he explained twice to Mother that signing voluntary relinquishment paperwork was better than having the Court involuntarily terminate her parental rights because DHS could subsequently use that to seek aggravating circumstances in any future proceedings involving any Children. (N.T., 3/23/2017, p.31 at 15-25; p.32 at 1-13).

17

## STANDARD OF REVIEW AND LEGAL ANALYSIS

In reviewing an appeal from an order terminating parental rights, the Superior Court adheres to the following standard: [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. In re: R.J.T., 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. Id.; R.I.S., [36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d 1215 (2015).

## The Trial Court Properly Conducted the Termination in Compliance with 23 Pa.C.S.A. §§2501, 2502, 2503, 2504 (a), (b), and 2711.[2]

[2] 23 Pa.C.S.A. §2501 **Relinquishment to Agency.** (a) **Petition.**—When any child under the age of 18 years has been in care of an agency for a minimum period of three days or, whether or not the agency has the physical care of the child, the agency has received a written notice of the present intent to transfer to it custody of the child, executed by the parent, the parent or parents of the child may petition the court for permission to relinquish forever all parental rights and duties with respect to their child. (b) **Consents.**—The written consent of a parent or guardian of a petitioner who has not reached 18 years of age shall not be required. The consent of the agency to accept custody of the child until such time as the child is adopted shall be required.

23 Pa.C.S.A. §2502 **Relinquishment to adult intending to adopt child.** (a) **Petition.**—When any child under the age of 18 years has been for a minimum of three days in the exclusive care of an adult or adults who have filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt), the parent or parents of the child may petition the court for permission to relinquish forever all parental rights to their child. . (b) **Consents.**—The written consent of a parent or guardian of a petitioner who has not reached 18 years of age shall not be required. The adult or adults having care of the child shall file a separate consent to accept custody of the child.

23 Pa.C.S.A. §2503 **Hearing.** (a) **General Rule.**—Upon presentation of a petition prepared pursuant to §2501 (relating to relinquishment to agency) or §2502 (relating to relinquishment to adult intending to adopt child), the court shall fix a time for hearing which shall not be less than ten days after filing of the petition. The Petitioner must appear at the hearing.

23 Pa.C.S.A. §2504. **Alternative procedure for relinquishment.** (a) **Petition to confirm consent to adoption.**—If the parent or parents of the child have executed consents to an adoption, upon petition by the intermediary or, whether there is no intermediary, by the adoptive parents, the court shall hold a hearing for the purpose of confirming a consent to an adoption upon expiration of the time periods under section 2711 (relating to consents necessary to adoption). The original consent or consents to the adoption shall be attached to the petititon. (b) **Hearing.**—Upon presentation of a petition filed pursuant to this section, the court shall fix a time for a hearing which shall not be less than ten days after filing of the petition. Notice of the hearing shall be by personal service or by registered mail or by such other means as the court may require upon the consenter and shall be in the form provided in section 2513(b) (relating to hearing). Notice of the hearing shall be given to the other parent or parents, to the putative father whose parental rights could be terminated pursuant to subsection (c) and to the parents or guardian of a consenting parent who has not reached 18 years of age. The notice shall state that the consenting parent's or putative father's rights may be terminated as a result of the hearing. After hearing, which shall be private, the court may enter a decree of termination of parental rights in the case of a relinquishment to an adult or a decree of termination of parental rights and duties, including the obligation of support, in the case of a relinquishment to an agency.

23 Pa.C.S.A. §2711. **Consents necessary to adoption.** (a) **General Rule.**—Except as otherwise provided in this part, consent to an adoption shall be required of the following: (1) the adoptee, if over 12 years of age. (2) the spouse of the adopting parent, unless they join in the adoption petition. (3) the parents or surviving parent of an adoptee who has not reached the age of 18 years. (4) the guardian of an incapacitated adoptee. (5) the guardian of an adoptee under the age of 18 years, if any there be, or of the person or persons having the custody of the adoptee, if any such person can be found, whenever the adoptee has no parent whose consent is required. (c) **Validity of consent.**—No consent shall be valid if it was executed prior to or within 72 hours after the birth of the child. A putative father may execute a

19

With regard to revocation of consent to adoption in relation to a voluntary relinquishment of parental rights, the Superior Court stated, "When reviewing a decree entered by the Orphan's Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans Court sits as the fact finder, it determines the credibility determinations absent an abuse of that discretion." In re K.GM., 845 A.2d 861, 863 (Pa.Super.2002).

In this matter, DHS filed a Petition for Involuntary Termination of Parental Rights on September 27, 2016, and a Contested Goal Change/Termination Hearing was held by this Court on October 13, 2016. Mother appeared on this date and was represented by her attorney, Ms. Frierson. At the hearing, Taneisha Clement, attorney for DHS, informed the Court that Mother had signed the Petition For Voluntary Relinquishment of Parental Rights, and the Consent of Birth Mother earlier that same day.

---

consent at any time after receiving notice of the expect or actual birth of the child. Any consent given outside the Commonwealth shall be valid for purposes of this section if it was given in accordance with the laws of the jurisdiction where it was executed. A consent to any adoption may only be revoked as set forth in this subsection. The revocation of a consent shall be in writing and shall be served upon the agency or adult to whom the child was relinquished. The following apply:
(1) Except as otherwise provided in paragraph (3):
(i) For a consent to an adoption executed by a birth father or a putative father, the consent is irrevocable more than 30 days after the birth of the child or the execution of the consent, whichever occurs later.
(ii) For a consent to an adoption executed by a birth mother, the consent is irrevocable more than 30 days after the execution of the consent.
(2) An individual may not waive the revocation period under paragraph (1).
(3) Notwithstanding paragraph (1), the following apply:
(i) An individual who executed a consent to an adoption may challenge the validity of the consent only by filing a petition alleging fraud or duress within the earlier of the following time frames:
(A) Sixty days after the birth of the child or the execution of the consent, whichever occurs later.
(B) Thirty days after the entry of the adoption decree.
(ii) A consent to an adoption may be invalidated only if the alleged fraud or duress under subparagraph (i) is proven by:
(A) a preponderance of the evidence in the case of consent by a person 21 years of age or younger; or
(B) clear and convincing evidence in all other cases.

20

Also at this hearing, this Court heard credible testimony in support of this petition, as to the five Children, by Tracey McNair, case manager CCS/CUA. He testified the Children were brought into care because of housing issues, deplorable housing, eviction, homelessness, inadequate housing, medical neglect, truancy, and accusations of the maternal grandmother abusing one of the Children. He further testified Mother had never completed any goals or objectives that were established for her, was somewhat bonded to the Children, however she ultimately could not provide the safety and permanency for her five Children.

After hearing the evidence regarding the involuntary termination, this Court took the matter in abeyance to await the expiration of the period of time in which Mother could withdraw her voluntary relinquishments. (N.T. 10/13/2016, p.18 at 3-12).

Subsequently, DHS filed the Petition for Voluntary Relinquishment and the *Consent of Birth Mother* on December 21, 2016, and another hearing was held on March 23, 2017.

Mother asserts on appeal that she signed the Petition For Voluntary Relinquishment and the Petition to Confirm Consent under duress and threat by the CUA social worker. This claim is without merit.

The record supports the credible testimony of Tracey McNair, case manager at CCS/CUA, who was present when Mother signed the documents on October 13, 2016. He testified credibly on the record, that Mother was not under the influence of any drugs or alcohol at the time, understood what she was reading and what he communicated to her regarding her voluntary relinquishment of her parental rights. Mother also

21

consulted and received legal advice from her attorney, Ms. Frierson, on that date prior to signing the documents. (N.T., 3/23/2017, p.27 at 10-25; p.28 at 1-20).

He further testified he did not promise Mother anything in return for her signing the documents, and he did not threaten nor pressure her. He opined that Mother signed the documents of her own free will and volition that day. He also testified he explained to Mother that signing could affect the Child she has who does not have any interaction with DHS. He did not believe this information would make Mother believe she was threatened or pressured. (N.T., 3/23/2017, p.29 at 8-16; p.30 at 1-10).

Mr. McNair further credibly testified that he did receive a telephone call from Mother wishing to revoke her consent. He advised her, during the call, to submit a written request and told her to contact Ms. Frierson, her attorney, to prepare a written revocation. (N.T., 3/23/2017,p.30 at 13-25; p.31 at 1-8).

This Court also finds credible the bonding testimony from Mr. McNair, who opined that although the Children were somewhat bonded to Mother, the Children looked to their foster parents for safety, comfort and to meet all of their daily needs. He opined that the Children would not suffer irreparable harm if Mother's rights were terminated and that termination of Mother's parental rights and adoption would be in the best interest of the Children.

This Court finds that Mother's consent was intelligent, voluntary, and deliberate. Further, neither Mother nor her attorney made any attempts to revoke that consent in writing as required by law. 23 Pa.C.S.A. §2711 (c)(3)(i) requires "an individual who executed a consent to an adoption may challenge the validity of the consent only by filing

22

a petition alleging fraud or duress within the earlier of the following time frames: (A) Sixty Days after the birth of the child or the execution of the consent, whichever occurs later. (B) Thirty days after the entry of the adoption decree." In this matter, 160 days had elapsed between the date Mother signed the voluntarily relinquishment documents on October 13, 2016, and March 23, 2017, when the second hearing occurred and Mother asserted she had revoked her consent. It is undisputed that Mother and her attorney failed to comply with the time frames outlined in the statute.

This Court complied with the requirements of 23 Pa.C.S.A. §§2501, 2502, 2503, 2504 (a), (b), and 2711, and entered a Decree of Voluntary Termination of Parental Rights for the five Children on March 23, 2017. Mother failed to prove by clear and convincing evidence that she acted under fraud or duress as required under paragraph 23 Pa.C.S.A. §2711 (c)(3)(i), and failed to adhere to time limit requirements of written revocation as required under 23 Pa.C.S.A. §2711 (c)(3)(i)(A).

## CONCLUSION

The Court concluded:

The uncontradicted evidence is that Mother was competent when explained the voluntary relinquishments. She was explained the impact of the relinquishments. The evidence is uncontested that the witness who observed believed her to be fully informed of the impact of the relinquishments both in terms of terminating her parental

23

rights and in terms of how such a document might affect the consideration of placement of other children going forward, in that, if her rights were involuntary terminated, it could be considered by operation of law as a factor effecting the placement of children, another child going forward could be considered as an aggravating circumstance which is a matter not within any discretion of the Court but a matter entered by operation of law.

The test is not whether she made a phone call to someone. The test is, did she file a written retraction of that statement. She was represented by current counsel at the time. Neither counsel nor Mother filed such a retraction. The statute is quite clear that the only way a retraction can be executed is by a written submission which is filed with the Court within the 30 day period allowed by law.

Mother's execution of the voluntary relinquishment of five children is deemed to be final and irrevocable, absent such a filing. Therefore, as a matter of law, mother's rights to the five children for whom she executed such document are terminated. (N.T., 3/23/2017, p.32 at 20-25; p.33 at 1-25; p.34 at 1-2).

For the foregoing reasons, this Court respectfully requests that the Order of March 23, 2017, be AFFIRMED.

BY THE COURT:

_____
ALLAN L. TERESHKO, Sr. J.

June 7th, 2017
DATE

25